**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

LEO LEWIS YEAGER,

              Defendant.

No.  16-CR-3031-MWB

**REPORT AND RECOMMENDATION
TO DENY DEFENDANT'S MOTION
TO SUPPRESS**

---

## I.    INTRODUCTION

Before me is defendant's motion to suppress evidence allegedly seized in violation of the Fourth Amendment to the United States Constitution.  Doc. 18.  The grand jury charged defendant in a one-count indictment with possession of a firearm as a felon.  Doc. 2.  The charge arose from an incident on August 25, 2016, when Humboldt County Sheriff's Deputies entered a house where defendant and his girlfriend were staying with his cousin.  Deputies were called to the location pursuant to a domestic abuse call.  After deputies arrested defendant and took a statement from his girlfriend, they accompanied her back to the house, at her request, while she retrieved her belongings.  While there, deputies seized a rifle, which is the subject of the indictment.  Defendant argues his girlfriend did not give voluntary consent to the deputies to enter the house to retrieve the firearm.  Defendant seeks an order suppressing all evidence from the house.

The Honorable Mark W. Bennett, Senior United States District Court Judge, referred this motion to me for a Report and Recommendation.  For the reasons that follow, I respectfully recommend that the Court deny defendant's motion to suppress.

## II.    FINDINGS OF FACT

On November 17, 2016, I held an evidentiary hearing on defendant's motion. I admitted into evidence government's Exhibits 1 (a dash-cam recording); 2 (statement by Samantha Zemke), 3 (signed inventory sheet); 4-8 (photographs); 9 (witness statement), and 10-12 (police reports). I also admitted into evidence defendant's Exhibits A (a collection of police reports and criminal histories), and B (an affidavit of Samantha Zemke, defendant's girlfriend). At the hearing, the government called Humboldt County Sheriff's Deputies Cory Lampe and Michael Vinsand, and Officer Erin Bennett of the Humboldt Police Department. Defendant called his girlfriend (Samantha Zemke) and his half-sister (Loreen Marshall). I make the following findings of fact based on this evidence.

### A. The Residence

Defendant's cousin, Richard Fitzgerald, occupied a house in the small town of Thor, in Humboldt County, Iowa, pursuant to a rent-to-own arrangement. Defendant and his girlfriend, Samantha Zemke, had recently moved in to that house. Defendant and his girlfriend had recently lived in Fort Dodge, Iowa, and still had some belongings in a rental unit in that city. Zemke testified that she is engaged to defendant and has been engaged to him for over a year. They have two young children together. At the time of these events, the children were staying with her parents in Fort Dodge, Iowa. Zemke testified that she had stayed in the house four nights before the assault. Apparently, only Fitzgerald had a key to the house.

### B. The Assault and Arrest of Defendant

On August 25, 2016, an argument between defendant and Zemke broke out over her alleged infidelity. Defendant assaulted Zemke in the house, choking her twice and causing her to black out. She fled the house and sought refuge with a neighbor. The

neighbor called 911, and Humboldt County Sheriff's Deputy, Cory Lampe, responded to the house. There, Deputy Lampe encountered the woman who called 911 and Zemke. The woman pointed out a man standing along the road, nearby, who was speaking to a woman in a truck, and indicated that he was the assailant. Deputy Lampe got in his vehicle in order to go speak with the man, but the truck pulled in behind him. Deputy Lampe got out and spoke to the woman in the truck. She identified herself as Loreen Marshall, defendant's half-sister. Deputy Lampe then got back in his vehicle and drove down the street where the man was still walking.

Deputy Lampe stopped the man, Leo Yeager (defendant), and spoke with him. Defendant admitted to having a physical altercation with Zemke. Defendant told Deputy Lampe the fight occurred because Zemke was packing up belongings because she was going to leave him. When defendant refused to voluntarily accompany Deputy Lampe back to the house so that Deputy Lampe could hear Zemke's side of the story, Deputy Lampe arrested defendant and placed him in the deputy's patrol vehicle.

When Deputy Lampe returned to the house, he spoke with Zemke, alone, who told Deputy Lampe that defendant had assaulted her, choking her to unconsciousness two times. She showed him red marks on her neck, which he photographed. Deputy Lampe also spoke briefly to the woman who called 911. That woman stated that she overheard a conversation between Zemke and Marshall during which they discussed a firearm located in defendant's residence.

Deputy Lampe decided, at this point, to formally charge defendant with domestic abuse assault and transport defendant to the County Jail.[1] The jail is located in a law enforcement center that also houses the Humboldt Police Department. Law enforcement officers asked Zemke to come to the law enforcement center to make a statement about the assault. Because Deputy Lampe was operating as the lone law deputy on duty at the

---

[1] On October 27, 2016, defendant pled guilty to, and was convicted of, the lesser-included offense of Serious Assault for this incident.

time, he could not transport both defendant and Zemke to the law enforcement center. He asked Marshall if she would be willing to give Zemke a ride to the law enforcement center, and Marshall agreed.

While Deputy Lampe was taking defendant to the jail, and after Deputy Lampe had advised defendant of his constitutional rights, defendant made a statement about possessing a rifle in his cousin's house. Defendant also admitted having spent several years in prison after being convicted of arson. Defendant told Deputy Lampe that defendant could possess a rifle, even though he acknowledged he was a felon, stating that he believed his felony status prohibited only his possession of handguns. When Deputy Lampe told defendant that he was prohibited from possessing any firearm, defendant claimed the rifle "technically" belonged to his cousin.

### C. Zemke's Statement and Consent to Search and Seize Firearm

Once they arrived at the law enforcement center, between approximately 8:30 and 9:00 p.m., Deputy Lampe took defendant into the jail to be booked. He also met with Zemke and Marshall, had them sit temporarily in the lobby of the law enforcement center, and then had them take a seat in a small room (approximately 8 foot by 6 foot) off the lobby. The door to the room remained open at all times. At this point, Humboldt Police Officer, Erin Bennett, arrived and took over obtaining a written statement from Zemke while Deputy Lampe returned to the jail to deal with defendant. In the room were Officer Bennett, Zemke, and Marshall.[2]

Officer Bennett provided Zemke with a statement form, at the top of which is written: "I [handwritten Samantha Zemke] am not under arrest for, nor am I being detained for any criminal offenses concerning the events I am about to make known to [handwritten Deputy Cory Lampe]. Without being accused of or questioned about any

---

[2] Marshall testified at the hearing that her fifteen-year-old son was also present, but no other witness indicated a minor child was present.

criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purposes it may serve." Exhibit 2. In her written statement, Zemke related the events surrounding the assault. No mention is made of the firearm or search in the written statement. Officer Bennett described Zemke as calm and very cooperative, but angry at defendant for what he did to her. At one point, Officer Bennett had to leave the law enforcement center to go on a different domestic abuse call, returning a short time later.

On direct examination, Zemke was asked whether she felt like she had to be at the law enforcement center. She replied, "No," she felt like she could go home and sleep.

At some point while Zemke was writing her statement, Deputy Lampe returned to the room. Officer Bennett and Marshall were present. Deputy Lampe had, in the meantime, looked up defendant's criminal history and confirmed that he was a convicted felon. Deputy Lampe asked Zemke about the rifle in the house. Zemke stated that the rifle belonged to both defendant and her, and that she believed defendant could lawfully possess a rifle, despite being a felon. Zemke stated she last saw the rifle hanging on the wall in the dining room of the house.

Zemke told Deputy Lampe that defendant and she had just moved in the residence, but that they still had belongings in another rental unit in Fort Dodge. Zemke expressed her desire to return to the house in Thor to retrieve her personal belongings. Officer Bennett testified that Zemke "absolutely" wanted to return to the house to get her personal belongings. Zemke indicated that she wanted officers to go with her when she retrieved her belongings because she was worried that defendant's cousin may be present or return to the house, and he may be upset with her about getting defendant in trouble. Zemke testified that defendant and his cousin were close. In an affidavit, Zemke stated that she "was asking Officer Lampe to come back to the house with me to get my clothes."

Exhibit B.  Deputy Lampe agreed to go along, stating: "I have to get the gun so, okay."[3] *Id*.  According to Officer Bennett's recollection, Deputy Lampe asked "Is that okay?"  According to Deputy Lampe, Zemke replied "that's fine."  Marshall agreed to give Zemke a ride back to the house in Thor.  Deputy Lampe stated that defendant had told him the house was locked, and Zemke did not have a key.  According to Deputy Lampe and Officer Bennett, Zemke responded "that's fine, I know how to get in because Leo [defendant] has done it before."

During the contact with Zemke at the law enforcement center, during which she consented to officers going to the house to retrieve the firearm, Deputy Lampe stated that he used a conversational tone.  In particular, when he told Zemke he needed to get the firearm, he stated he used a conversation tone and did not use a harsh tone or raise his voice in such a way as to make it sound like a command.  None of the witnesses, including Zemke, contradicted Deputy Lampe regarding his tone of voice.  Deputy Lampe did not tell Zemke she could refuse consent to have law enforcement officers enter the house and seize the firearm.  Deputy Lampe and Officer Bennett were in uniform and wearing sidearms, but their firearms remained holstered at all times.

At the hearing, Zemke testified that she did not feel she could refuse consent when Deputy Lampe said he needed to get the gun.  When I asked her why she felt that way, however, Zemke said she did not think she could refuse a request made by a law enforcement officer.  I asked her if there was any other reason, but she could not articulate any.  Zemke testified that no officer threatened her with criminal charges or suggested she would get in trouble if she did not agree to allow them to retrieve the firearm.

---

[3] Deputy Lampe testified that he told Zemke he needed to get the gun because defendant cannot possess any firearm.

### D. Search and Seizure

Deputy Lampe had Marshall follow his patrol car to the house in Thor. Deputy Lampe also arranged for Deputy Michael Vinsand (whose shift was just starting) to meet him at the residence. They arrived at approximately 9:30 p.m., and it was dark outside. Once at the residence, Zemke attempted to enter the house through the front door, but discovered it was locked. Defendant's cousin, Richard Fitzgerald, was not home at the time. Deputy Lampe asked her if there was any other way into the house. Zemke said she had seen defendant enter through an unlocked window. Zemke testified at the hearing that she had seen defendant's cousin get into the house through a window once when he locked his keys inside, and saw defendant enter the house through a window twice, once during the four days she had stayed with him in the house prior to the assault. Zemke attempted to enter the house through a window on the front of the house through which she stated she had seen defendant enter the house. It was locked, however.

While Zemke was attempting to enter the house through the front window, Deputy Vinsand walked around to the back of the house and saw a window with an air-conditioner exhaust hose sticking out. According to Zemke's affidavit, Vinsand stated: "Hey, I found a way she can get in." Exhibit B. This is consistent with Deputy Vinsand's testimony that when he saw the window in that condition, he told the others and then stood back and let Zemke gain entry. Again, according to Zemke's affidavit, she asked Deputy Lampe what he wanted her to do, and he told her to push the vent in, climb through the window, and let them in through the front door. *Id*. In her affidavit, Zemke said she did that. *Id*. Deputies Lampe and Vinsand stated that they let her climb through the window on her own. Zemke testified that neither officer touched her and, although one of them brought her a chair to step on, she did not use it. Neither deputy, nor Zemke, mentioned Marshall being present at the back of the house, but Marshall testified that she was there, and that Zemke used a chair, and that the officers pushed the air conditioner exhaust aside, lifted the window, and physically assisted Zemke in through the window.

I did not find Marshall's testimony credible in this regard because it was inconsistent with the rest of the testimony.

At the hearing, Zemke testified that after she was unsuccessful in getting into the house through a front window, she suggested they give up and she would come back another day to get her clothes. Zemke testified that in response, deputies told her that they were not going to leave the house without the gun. Marshall corroborated this version of events. I find this version to be incredible for several reasons. First, Zemke made no mention of such an exchange in the affidavit she provided prior to the hearing. Exhibit B. She testified at the hearing that the statements she made in that affidavit were true and correct. Second, I believe the testimony of Officer Bennett and Deputy Lampe that Zemke "absolutely" wanted to get into the house to retrieve her belongings and was very fixated on that goal, including when she was at the house. At the same time, Zemke was concerned about the reaction defendant's cousin would have regarding her role in defendant's arrest. The idea that Zemke would give up trying to get in the house and would choose to contact the cousin later is inconsistent with this evidence. I also watched the demeanor and listened to the tone of the testimony of both Zemke and Marshall and found their testimony not credible. Each has a strong motive to shade the truth because of their relationship with defendant, and defendant had called each of them after his arrest and before the hearing. When this is combined with defendant having assaulted Zemke to the point of causing her to black out, I believe Zemke, in particular, had a strong motive to shade the truth to benefit her fiancé and the man who attacked her.

In any event, Zemke entered through the window and then let the deputies in through the front door. Zemke testified at the hearing that the officers just barged in the house without asking and that she only wanted them outside the house. She testified that once it was clear defendant's cousin was not there, she felt the deputies could leave. Deputy Lampe testified that Zemke opened the door and told them to "come in." I believe Deputy Lampe. Again, I found Zemke's testimony incredible for a number of reasons. First, in her affidavit, she made no such claim. Exhibit B. Second, her version

is inconsistent with her desire to have the officers at the house to protect her from defendant's cousin. Third, it is inconsistent with her prior consent at the law enforcement center telling Deputy Lampe that it was "fine" with her for him to seize the firearm. Finally, it is inconsistent with her conduct in opening the door for the deputies to enter.

Once in the home, Zemke took the deputies in to the living room, pointed out the firearm hanging on the wall, and then went upstairs to retrieve her belongings. The deputies seized the firearm and wrote out a property receipt. Zemke then wrote a statement on a property receipt, stating: "I told the officer he can take the gun." Doc. 18-2, at 17 (Exhibit A, page 17).

Zemke continued looking for belongings and was upset because she could not find all of her clothes. At one point, Zemke and Marshall suggested they come back another day to get Zemke's clothes, but Deputy Lampe suggested it would be best to keep looking because they had time and defendant's cousin was gone. The deputies attempted to help Zemke find her clothes, but without success. Zemke also showed Deputy Lampe the locations within the residence where defendant attacked her, and Deputy Lampe took photographs of those locations. Ultimately, Zemke loaded some clothes, a television, and a PlayStation into Marshall's car and left.

### E. Samantha Zemke

At the time of this incident, Zemke was twenty-six years old. She graduated from high school, worked full time in a retail store, and handled all the finances for her family consisting of defendant and their two minor children. She was arrested one time, approximately three years ago, for disturbing the peace, but the charges were dropped. She had no other experience with searches by law enforcement officers. She testified she has dyslexia, but has overcome the problem and is able to read and write. Although Deputy Lampe agreed with defense counsel that Zemke is rather naïve, or as Deputy Lampe said is more accurate, not very intelligent, he based that assessment on her spoken

vocabulary and on the spelling mistakes she made in her written statement. I listened to and watched Zemke testify; I find she is of average intelligence and strong-willed.

Zemke testified that she had not consumed alcohol or controlled substances on August 25, 2016. Deputy Lampe testified that he did not have any reason to believe that Zemke was under the influence of alcohol or controlled substances.

In general, I did not find Zemke entirely credible as a witness. The tone of her voice became markedly heightened and agitated when she began speaking about the search, volunteering answers without being asked, and purporting to indicate the officers adopted an aggressive position with her about getting into the house. Zemke was also hostile on cross examination. Zemke has a motive to shade the truth because she is still engaged to defendant, is the mother of his two children, has put $200 to $300 on his books while he has been in jail, and has maintained contact with him since his incarceration, despite a no-contact order.

### F. Defendant's Contact with Zemke Since His Arrest

After officers arrested defendant for domestic abuse, he was briefly detained and then released. A state no-contact order was in place. He violated the order when he was found in a car with Zemke. He was then arrested on the instant federal charge. The Court ordered him detained pending trial in this matter, noting as grounds, the existence of the no-contact order and expressing the belief that defendant posed a danger to Zemke. Thereafter, defendant violated the no-contact order multiple times by calling Zemke from jail. Those calls were recorded. Zemke testified that defendant called her a lot from jail. She also stated that defendant called his sister, Loreen Marshall, another sister, and his cousin. During some of the phone calls, Zemke sought defendant's permission, or at least agreement, with things such as whether she should dress in a 1970s style for a work-related event, and whether she should/could take their children to a pumpkin patch.

### III.   APPLICABLE STANDARDS

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures, and requires a showing of probable cause.   Fourth Amendment rights are personal in nature; in other words, a person can assert a Fourth Amendment claim only as to property in which a person has a reasonable expectation of privacy. *United States v. Douglas*, 744 F.3d 1065, 1071 (8th Cir. 2014).   That right to privacy exists where a defendant asserts a subjective expectation of privacy, and that expectation is reasonable and one society is willing to accept.   *United States v. Kiser*, 948 F.2d 418, 423 (8th Cir. 1991).   Accordingly, police do not violate a defendant's Fourth Amendment rights when they seize property from a third party, even if that seizure would have violated the third party's Fourth Amendment rights.   *Rakas v. Illinois*, 439 U.S. 128, 134 (1978).

Police entry into a house without a search warrant is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980).   The Fourth Amendment does not, however, prohibit the warrantless search of a house when police obtain valid consent. *United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010).   Police may enter a residence with the consent of any person who owns the residence or who possesses "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974).   The government bears the burden of proof to establish the existence of effective consent.   *Florida v. Royer*, 460 U.S. 491, 497 (1983) (holding that the government has the burden of showing that consent to search was "freely and knowingly given").

Common authority over premises exists where there is mutual use, and joint access or control.   *See Matlock*, 415 U.S. at 171 n.7 (noting that common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right.").   There exists a continuum along which some

third parties have the authority to consent to a search, while others do not. Spouses and live-in girlfriends, for example, have the authority to consent to a search. *See*, *e.g.*, *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009) (holding that a defendant's girlfriend who had unrestricted access to the house for three months had common authority); *United States v. Jones*, 193 F.3d 948, 950 (8th Cir. 1999) ("[A]n adult co-occupant of a residence may consent to a search"); *United States v. Duran*, 957 F.2d 499, 505 (7th Cir. 1992) (holding that "a spouse presumptively has authority to consent to a search of all areas of the homestead."). An overnight guest has a reasonable expectation of privacy in a residence sufficient to grant consent to search it. *Minnesota v. Olson*, 495 U.S. 91, 96 (1990). On the other hand, a neighbor asked to watch a house while the homeowner was gone lacks authority to consent to a search of the house. *United States v. Selberg*, 630 F.2d 1292, 1294 (8th Cir. 1980). Similarly, a person who only frequented an apartment, but did not reside there, does not have the authority to consent to a search of the apartment. *United States v. Harris*, 534 F.2d 95, 97 (7th Cir. 1976). It is not necessary for the third party to have a key to a house to have authority to grant consent to search. *Iron Wing v. United States*, 34 F.3d 662, 665 (8th Cir. 1994).

To be valid, consent to search must be knowing and voluntary. *See*, *e.g.*, *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) ("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given."); *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011) (holding that to be valid, a consent to search must be knowing and voluntary). The government bears the burden of proving a voluntary and knowing consent by a preponderance of the evidence. *United States v. Farnell*, 701 F.3d 256, 262-63 (8th Cir. 2012); *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007). Ultimately, a consent to search is voluntary if it was "the product of an essentially free and unconstrained choice by its maker," rather than "the product of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 & 227 (1973). See also *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990) (holding that a consent

to search is voluntary "if it was 'the product of an essentially free and unconstrained choice by its maker,' rather than 'the product of duress or coercion, express or implied.'").

In determining whether consent was voluntary, a court looks at the totality of the circumstances, including the environment in which the consent was allegedly given, and the person who allegedly gave the consent. *See, e.g.*, *United States v. Zamoran-Coronel*, 231 F.3d 466, 468 (8th Cir. 2000); *United States v. Arreloa*, 250 Fed. App'x 765, 767 (8th Cir. 2007). Courts have identified a number of factors which aid in this analysis, but they should not be applied mechanically. *Chaidez*, 906 F.2d at 381. Nor is any one factor determinative. *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000).

> Environmental factors include whether the person who consented:
>
> (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Chaidez*, 906 F.2d at 381 (internal citations omitted). *See also United States v. $231,930.00 in United States Currency*, 614 F.3d 837, 845 (8th Cir. 2010) (setting forth environmental factors); *Golinveaux*, 611 F.3d at 959 (same). Other courts have identified other environmental factors. These include the tone of the communication between the law enforcement officer and the person granting consent, and the time of day when the person granted consent. *Quintero*, 648 F.3d at 666-68. Finally, if officers inform the person that they may refuse consent to search, it might ameliorate the coercive impact of other environmental factors. *Chaidez*, 906 F.2d at 381-82.

Factors relating to the person who allegedly granted consent include the person's (1) age; (2) general intelligence and education; (3) whether the person was under the influence of any drugs or alcohol; (4) whether the person signed a consent form; (5) whether officers advised the person of their constitutional rights; and (6) the person's familiarity with the criminal justice system. *Zamoran-Coronel*, 231 F.3d at 469-70.

Courts also consider "whether the [consenting person's] contemporaneous reaction to the search was consistent with consent." *United States v. Jones*, 254 F.3d 692, 696 (8th Cir. 2001).

## IV.    ANALYSIS

Defendant claims the officers violated his rights under the Fourth Amendment to the Constitution when they conducted an unlawful entry into and search of the home he was sharing with his cousin and Zemke. Defendant's motion raises three issues: (1) did Zemke have the apparent authority to grant consent to search the house and seize the firearm; (2) did Zemke give consent to a search of the house and the seizure of the firearm; and (3) was the consent voluntary. In its resistance, the government argues that Zemke gave voluntary consent; but, alternatively, asserts the inevitable discovery doctrine. I will address each of these issues in turn.

### A. Apparent Authority to Consent to Entry into the Residence

Although defendant does not directly claim his girlfriend lacked the apparent authority to grant consent to the deputies to enter the house, I find it appropriate to address this issue. In short, I find the deputies reasonably believed Zemke had the apparent authority to authorize a search and seizure of the firearm, and that she also, in fact, had the authority to authorize such a search and seizure. In assessing the constitutionality of the officers' conduct, it is important to take into account the totality of the circumstances and the context within which the officers acted. The fundamental touchstone of the Fourth Amendment is "reasonableness." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

In assessing the reasonableness of the officers' conduct, and the extent of Zemke's apparent authority to grant consent, the Court must consider the context and scope of the consent granted. The context, here, involved officers responding to a domestic abuse incident. Thus, in assessing the reasonableness of Deputy Lampe's conduct and his

assessment of whether Zemke had the apparent authority to grant consent, the Court must consider the limited consent granted. For example, had Zemke granted consent to search the entire house, or even defendant's bedroom, a court might find that an officer could not reasonably believe she had the apparent authority to do so. Here, Zemke consented only to entry into the house while she collected clothes and so that officers could retrieve a firearm to which she claimed partial ownership. Deputy Lampe never exceeded the limited scope of Zemke's consent.

The totality of the circumstances supports Deputy Lampe's reasonable belief that Zemke had the authority to grant the limited consent to accompany her into the house. Zemke stated that she had recently moved in to the residence with defendant. She also told Deputy Lampe that she had belongings in the house that she wanted to retrieve. Finally, defendant told Deputy Lampe the fight occurred because Zemke was packing up belongings because she was going to leave him, implying, of course, that she had been staying with him.

Zemke testified that she told Deputy Lampe that she did not live in the house. It is true that she listed her address as 6th Avenue in Fort Dodge, Iowa. Doc. 18-2, at 3. Zemke provided this information after defendant had apparently violently assaulted her. It is understandable, under these circumstances, that she would not continue to list as her address the house where she was assaulted and from which she had expressed the intent to retrieve belongings so she could leave. Regardless, there was certainly sufficient information available to Deputy Lampe for him to reasonably believe that Zemke was at least an overnight guest in the house in Thor, even if she considered her permanent residence to be elsewhere.

Based on the totality of the circumstances, I find it was reasonable for the deputies to believe Zemke had the apparent authority to consent to have deputies accompany her into the house while she recovered her personal belongings, and to retrieve the firearm. I find that the deputies never exceeded the scope of that limited consent.

I also find, in the alternative, that Zemke had the actual authority to grant consent to search the room. The evidence established that Zemke had lived in the house for at least four days prior to the search, and had clothing and other belongings, including the rifle, in the house. Her belongings were located in more than one room. These facts, together with all of the facts known to the deputies, establish that Zemke was living in the house for some period of time sufficient for her to have a reasonable expectation of privacy in the house. Accordingly, I find Zemke had the actual authority to grant consent for the deputies to enter the house where she had been living.

Zemke's entry into the house through an open window at first blush appears to be conduct inconsistent with someone who has a reasonable expectation of privacy in a residence sufficient to grant consent to law enforcement officers to enter the residence. In other words, one might initially think that anyone who has to break in to a house cannot possibly have the authority to grant others consent to search that residence. I conclude, however, that this is essentially a red herring. If, as I conclude, a reasonable officer would believe Zemke had the authority to grant consent to search the house, the fact she lacked a key to the house and was locked out does not eliminate her apparent authority. That Zemke had to gain entry by crawling in a window might cause a reasonable officer to pause and re-think whether the person had a reasonable expectation of privacy in the house. Nevertheless, in this case, Zemke told Deputy Lampe that she had seen defendant gain entry into the house in the same manner. Indeed, Zemke testified that she had seen defendant enter the house through a window on multiple occasions and saw his cousin do so once. Accordingly, although it is an unusual fact, I do not find that how Zemke entered the house alters the answer to whether she had the apparent or actual authority to grant consent under these circumstances.

### B. Did Zemke Grant Consent

Defendant does not seriously dispute that Zemke gave consent to the deputies to enter the house and seize the firearm. Rather, defendant challenges the voluntariness of that consent. In any event, I find that Zemke did give consent to the deputies to enter the house and seize the firearm. I credit the testimony of Deputy Lampe and Officer Bennett who, taking their testimony together, indicated that Deputy Lampe told Zemke he needed to get the gun, asked "is that okay," and Zemke said "that's fine." Even if these exact words were not exchanged, Deputy Lampe clearly expressed his intent to seize the firearm when he assented to accompany Zemke to the house for her to collect her belongings. When she and Deputy Lampe arrived at the house, Zemke entered the house and then went to the front door and let the deputies in the house and pointed out the location of the firearm. If Zemke did not want the deputies in the house, she could have simply not opened the door. Her act of opening the door for the deputies was conduct consistent with an invitation for them to enter. Further, when she took the deputies to the firearm and pointed it out to them, knowing that Deputy Lampe had previously expressed an intent to seize the firearm, it was conduct indicating consent to take the firearm. Finally, when Zemke signed the inventory sheet, she wrote: "I told the officer he can take the gun." Exhibit 3.

Having found Zemke granted consent, I now turn to the real issue in dispute and that is whether that consent was given voluntarily.

### C. Was the Consent Voluntary

Based on the totality of the circumstances, I find that the government has established by a preponderance of the evidence that Zemke voluntarily gave consent to the deputies to enter the house where she was staying, and seize the firearm in which she claimed partial ownership.

In this case, none of the environmental factors suggest Zemke was coerced or under duress when she granted consent. Zemke came to the law enforcement center

voluntarily, at the deputy's request. She testified that she did not believe she was required to be there. She was not at the law enforcement center for a long time, arriving sometime between 8:30 and leaving around 9:30, during which time she filled out a statement about the assault. At no point did any law enforcement officer threaten her, physically intimidate her, or punish her. Deputy Lampe and Officer Bennett were armed, but their service weapons remained holstered at all times. Deputy Lampe made no promises or misrepresentations to Zemke to obtain her consent to enter the house and take the firearm. Zemke was not in custody or under arrest at any time. Consent was given in the police department, where defendant's sister was present and assisting Zemke by providing her with moral support, further decreasing the coercive atmosphere. Not only did Zemke not protest the search; she voluntarily opened the door of the house for the deputies and then took them to the location of the firearm, pointed it out, and signed a receipt indicating that she told the officer he could take the gun. Zemke's contemporaneous reaction during the search, therefore, was consistent with voluntary consent. I find the tone of the conversation between Deputy Lampe and Zemke was at all times calm and professional, based on the testimony of the witnesses and as reflected in the polite and professional manner in which Deputy Lampe interacted with everyone at the scene. Exhibit 1. The interaction occurred during the evening hours, which I find was a reasonable time of day that did not create a coercive atmosphere.

As far as factors relevant to Zemke herself, she was 26 years old at the time. She appeared to me of average intelligence; she graduated from high school. She works full time and handles all the finances for her family. I did not find her naïve. To the contrary, I found her to be fairly strong-willed and not easily coerced. Zemke denied being under the influence of either drugs or alcohol at the time she granted consent, and Deputy Lampe did not observe any indication to the contrary. Zemke did sign a consent form, of sorts, when she signed the inventory and stated that the officers could take the gun. The deputies did not advise Zemke of her constitutional rights, but, of course, there was no need to do so in this case as she was a victim of an assault and was not charged or

being threatened with any charges. Zemke had limited familiarity with the criminal justice system; she had been arrested on only one occasion and had never been present when officers searched a car or residence. Finally, her reaction during the search was consistent with voluntary consent; again, she voluntarily opened the door to the deputies and took them to the location of the firearm.

In his brief, defendant argued that the deputies' conduct in directing Zemke to follow them to the residence had a coercive effect. I disagree. This is not a case where Zemke was left with no choice but to follow the deputy. *See, e.g.*, *United States v. Pena-Saiz*, 161 F.3d 1175, 1177 (8th Cir. 1998) (officers walked off with defendant's package, leaving defendant with no choice but to follow). The deputies did not have any of Zemke's property, her identification, or anything else of hers that would have required her to follow them. Zemke intended to go to the house to retrieve her belongings, regardless of the deputies' intent to seize the firearm. Moreover, she was in a car separate from the deputies and, therefore, free to follow or not follow them. Zemke had asked the deputies to accompany her to the house for her protection. There was nothing coercive under those circumstances, then, for the deputies to direct Zemke to follow the police vehicle to the house.

Defendant argues that the deputy's statement that he was going to have to take the firearm was coercive in nature and suggested to Zemke that she had to comply. The deputy's statements to Zemke were not coercive, demanding, or threatening. Deputy Lampe's tone was calm and conversational when he assented to accompany Zemke to the house so she could retrieve her belongings. He simply said he needed to get the firearm anyway. She stated that was fine. This is a far cry from officers standing outside a hotel room and screaming demands that the occupants open the door. *See United States v. Conner*, 127 F.3d 663, 666 & n.2 (8th Cir. 1997) (finding consent was involuntary when officers knocked on hotel room door loud enough to awaken a guest in a nearby room and "demanded" the occupant "open up").

Defendant alleges Zemke's consent was not voluntary, in part, because it was first given in the presence of uniformed deputies at the law enforcement center, an environment that had a coercive effect on Zemke. I find the atmosphere was not coercive. She was in a small room, but the door to the lobby was open at all times. Zemke had Marshall with her at all times, lending her moral support and decreasing the coercive atmosphere. For a period, there were no law enforcement officers present while Deputy Lampe was dealing with defendant and Officer Bennett was responding to another domestic abuse call. Zemke testified that she felt she could leave. Although Zemke testified that she did not feel free to refuse consent to search, when I asked why she felt that way all she could say is that she did not believe she could refuse the request of a law enforcement officer. As the Eighth Circuit Court of Appeals has cogently stated, however, that type of passive atmospheric pressure does not make consent constitutionally involuntary.

> [T]he mere presence of some police officers in a confined space does not necessarily exert coercion of a constitutionally-defective nature. Police officers, whether uniformed or not, necessarily exert some moral and administrative authority. Indeed, such authority and whatever naturally persuasive effect accompanies it, goes to the very core purpose of having visible officers entrusted with keeping the peace . . . . Such, however, does not offend the Constitution.

*Zamoran-Coronel*, 231 F.3d at 469 (internal citation omitted).

Defendant also emphasized in argument that the deputies never informed Zemke that she could refuse consent. The fact that deputies did not inform Zemke that she could refuse consent to search and seize the firearm "merits little concern, as the evidence does not show that the officers engaged in any wrongdoing or constitutionally coercive conduct that would have suggested to a reasonable person that she had no such right." *Zamoran-Coronel*, 231 F.3d at 470.

Finally, defendant argues that Zemke withdrew consent at the house. Specifically, defendant argues that after Zemke was unsuccessful in getting in the front window, she

announced that she was willing to give up and come back another day to get her belongings and claims Deputy Lampe stated that they were not leaving the house without the gun. Having watched and listened to the witnesses when they testified, I do not believe this verbal exchange occurred. As noted above, it is inconsistent with Zemke's emphatic desire to get her belongings and inconsistent with the manner in which Deputy Lampe comported himself throughout this event.

Even assuming, however, that this verbal exchange occurred as Zemke claims, I do not find that it constituted a withdrawal of her consent, or that it turned an otherwise voluntary consent in to an involuntary one. Even assuming Zemke stated her desire to give up the attempt to get into the house, she did not verbally communicate that she was withdrawing consent for the officers to enter the house to retrieve the firearm. Moreover, even if Deputy Lampe stated that he was not leaving without the firearm, Zemke did not testify that he made the statement in a loud or commanding manner. Moreover, the statement is, at best, vague because it may very well have reflected his intent to obtain a search warrant if they could not gain entry with Zemke's help. Finally, Zemke's conduct afterwards remained consistent with granting consent, and there were no other environmental or personal factors, as outlined above, that suggest consent was involuntary.

In summary, I find Zemke's consent was the product of an essentially free and unconstrained choice and not the product of duress or coercion, express or implied.

### D. Inevitable Discovery

The government argues, in the alternative, that "even if, for the sake of argument, Miss Zemke's consent is found to have been involuntary, the gun evidence should not be suppressed as it would have been inevitably discovered by officers who had probable cause to obtain a warrant for the house." Doc. 30, at 5. Having found Zemke had the apparent and actual authority to grant consent to search and seize the firearm, and voluntarily gave such consent, the Court need not reach the inevitable discovery

argument. In the event the Court disagrees with my analysis, however, I will address the application of the inevitable discovery doctrine to this case.

In the Eighth Circuit,[4] for the inevitable discovery doctrine to apply, the government must demonstrate: "(1) a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) and active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Allen*, 713 F.3d 382, 387 (8th Cir. 2013). In other words, the inevitable discovery doctrine does not function as an ex post facto safety net that excuses constitutional violations so long as the government can hypothesize some other constitutional means by which officers could have achieved the same end. *See United States v. Thomas*, 524 F.3d 855, 862 (8th Cir. 2008) (Colloton, J., concurring) (stating that it is not enough for the government "to establish that the execution of routine police procedure or practice inevitably would have resulted in discovery of disputed evidence."). Rather, it requires a showing that at the time of the violation officers were, in fact, pursuing an alternative constitutional means that would have inevitably led to the same evidence. It cannot merely be a speculative possible means of investigation. *See United States v. James*, 353 F.3d 606, 617 (8th Cir. 2003) ("The law requires that the government prove that there was, at the time of the search . . . an actual other investigation that would have led to discovery of the otherwise unconstitutionally obtained evidence.").

I find in this case that the government has failed to establish that the firearm would have been inevitably discovered. I agree with the government that probable cause existed at the time the officers the house pursuant to Zemke's consent to search the residence and seize the firearm. Perhaps Deputy Lampe should have taken the time to obtain a search

---

[4] As defendant points out, although the Fifth and Eleventh Circuit Courts of Appeal share the same test as the Eighth Circuit, other circuits omit the requirement that the government show an "active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation." Doc. 33, at 1 n.1.

warrant, which would have obviated this motion to suppress.  On the other hand, Deputy Lampe was acting as the lone deputy on duty and the possibility existed that defendant's cousin may remove the firearm during the time it would take to apply for, obtain, and execute a search warrant.  The government's inevitable discovery argument fails, however, at the second prong of the test.  That is, the government has failed to make a showing of active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation.  To satisfy this prong, the government needed to show that there was some effort at the time to pursue a search warrant for the residence.  This could have been proven, for example, by testimony that Deputy Lampe discussed with another deputy applying for a search warrant should Zemke decline consent.  Had one of the deputies begun the process of writing an application for a search warrant, then that would have constituted even better evidence, of course, that law enforcement officers were pursuing a substantial, alternative line of investigation at the time.  Here, there was no evidence presented that the deputies had engaged in any step toward obtaining a search warrant.  At most, Deputy Lampe testified that he had in his mind the intent to apply for a search warrant should the consent search not work.  That is not enough.

At the hearing, the government made a compelling argument that inevitable discovery needs to be viewed in light of the real world existence of small town Iowa law enforcement.  In other words, the government pointed out that Deputy Lampe was working alone that night.  Officer Bennett assisted for a brief time, but was apparently the only other law enforcement officer on duty that night.  Deputy Vinsand came on duty that night as Deputy Lampe was supposed to be getting off duty.  The government argued that, under these circumstances, it is unreasonable for the law to require a lone officer to begin taking steps toward another means of executing a search until after the first step has failed to work.  In other words, a lone officer is not really in a position to begin pursuing two alternative routes toward a search at the same time.  Although I am sympathetic to this argument, I find no support in the law of the Eighth Circuit for such a distinction.

Accordingly, I find that the government has failed to prove that it would have inevitably discovered and seized the firearm through a search warrant because there is no evidence that at the time the law enforcement officers were actually pursuing an alternative means of investigation.

## V.    *CONCLUSION*

For the reasons set forth above, I respectfully recommend the Court **deny** defendant's motion to suppress (Doc. 18).

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CRIM. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CRIM. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED t**his 21st day of November, 2016.

_____

C.J. Williams
United States Magistrate Judge
Northern District of Iowa