# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR16-3031-MWB |
| vs. | |
| LEO LEWIS YEAGER, | **MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO SUPPRESS** |
| Defendant. | |

_____

## TABLE OF CONTENTS

I.     INTRODUCTION AND BACKGROUND ............................................................. 1
    *A.*     *Procedural Background* .............................................................................. 1
    *B.*     *Factual Background* ................................................................................... 3
II.     LEGAL ANALYSIS .............................................................................................. 12
    *A.*     *Standard of Review* .................................................................................. 12
    *B.*     *Yeager's Objections* ................................................................................. 13
III.     CONCLUSION .................................................................................................... 15

## I.     INTRODUCTION AND BACKGROUND

### *A.*     *Procedural Background*

This case is before me on United States Magistrate Judge C.J. Williams's Report and Recommendation to Deny Defendant's Motion to Suppress (docket no. 38). In his Report and Recommendation, Judge Williams recommends denying defendant Leo Lewis Yeager's Motion to Suppress.

On September 22, 2016, an Indictment was returned against Yeager, charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Yeager subsequently filed a Motion to Suppress in which he seeks to suppress evidence found in alleged violation of his Fourth Amendment rights when the police unlawfully entered and searched his cousin's house where Yeager and his girlfriend were staying. Specifically, Yeager contends that his girlfriend did not consent to the search of the house. Yeager, alternatively, contends that, if his girlfriend did consent to a search of the house, that consent was not voluntary. Yeager requests that all evidence seized from the house be suppressed. The prosecution filed a timely resistance to Yeager's motion.

Yeager's Motion to Suppress was referred to Judge Williams pursuant to 28 U.S.C. § 636(b). Judge Williams subsequently conducted an evidentiary hearing at which the prosecution presented the testimony of Humboldt County Sheriff's Deputies Cory Lampe and Michael Vinsand, and Humboldt Police Officer Erin Bennett. Yeager offered the testimony of Samantha Zemke, his girlfriend, and Loreen Marshall, his half-sister. After the hearing, Judge Williams filed a Report and Recommendation in which he recommends that Yeager's Motion to Suppress be denied. Judge Williams concluded that Zemke had both apparent and actual authority to authorize a search of the house. Judge Williams further concluded that Zemke had voluntarily consented to the deputies entering the house and seizing the rifle. Judge Williams also found that Zemke never withdrew her consent. Finally, Judge Williams determined that the prosecution failed to establish that the rifle would have inevitably been discovered.

Yeager has filed objections to Judge Williams's Report and Recommendation. The prosecution, in turn, filed a timely response to Yeager's objections. I, therefore, undertake the necessary review of Judge Williams's recommended disposition of Yeager's Motion to Suppress.

## B. Factual Background

In his Report and Recommendation, Judge Williams made the following factual findings:

### A. The Residence

Defendant's cousin, Richard Fitzgerald, occupied a house in the small town of Thor, in Humboldt County, Iowa, pursuant to a rent-to-own arrangement. Defendant and his girlfriend, Samantha Zemke, had recently moved in to that house. Defendant and his girlfriend had recently lived in Fort Dodge, Iowa, and still had some belongings in a rental unit in that city. Zemke testified that she is engaged to defendant and has been engaged to him for over a year. They have two young children together. At the time of these events, the children were staying with her parents in Fort Dodge, Iowa. Zemke testified that she had stayed in the house four nights before the assault. Apparently, only Fitzgerald had a key to the house.

### B. The Assault and Arrest of Defendant

On August 25, 2016, an argument between defendant and Zemke broke out over her alleged infidelity. Defendant assaulted Zemke in the house, choking her twice and causing her to black out. She fled the house and sought refuge with a neighbor. The neighbor called 911, and Humboldt County Sheriff's Deputy, Cory Lampe, responded to the house. There, Deputy Lampe encountered the woman who called 911 and Zemke. The woman pointed out a man standing along the road, nearby, who was speaking to a woman in a truck, and indicated that he was the assailant. Deputy Lampe got in his vehicle in order to go speak with the man, but the truck pulled in behind him. Deputy Lampe got out and spoke to the woman in the truck. She identified herself as Loreen Marshall, defendant's half-sister. Deputy Lampe then got back in his vehicle and drove down the street where the man was still walking.

Deputy Lampe stopped the man, Leo Yeager (defendant), and spoke with him. Defendant admitted to having a physical altercation with Zemke. Defendant told Deputy Lampe the fight occurred because Zemke was packing up belongings because she was going to leave him. When defendant refused to voluntarily accompany Deputy Lampe back to the house so that Deputy Lampe could hear Zemke's side of the story, Deputy Lampe arrested defendant and placed him in the deputy's patrol vehicle.

When Deputy Lampe returned to the house, he spoke with Zemke, alone, who told Deputy Lampe that defendant had assaulted her, choking her to unconsciousness two times. She showed him red marks on her neck, which he photographed. Deputy Lampe also spoke briefly to the woman who called 911. That woman stated that she overheard a conversation between Zemke and Marshall during which they discussed a firearm located in defendant's residence.

Deputy Lampe decided, at this point, to formally charge defendant with domestic abuse assault and transport defendant to the County Jail. The jail is located in a law enforcement center that also houses the Humboldt Police Department. Law enforcement officers asked Zemke to come to the law enforcement center to make a statement about the assault. Because Deputy Lampe was operating as the lone law deputy on duty at the time, he could not transport both defendant and Zemke to the law enforcement center. He asked Marshall if she would be willing to give Zemke a ride to the law enforcement center, and Marshall agreed.

While Deputy Lampe was taking defendant to the jail, and after Deputy Lampe had advised defendant of his constitutional rights, defendant made a statement about possessing a rifle in his cousin's house. Defendant also admitted having spent several years in prison after being convicted of arson. Defendant told Deputy Lampe that defendant could possess a rifle, even though he acknowledged he was a felon, stating that he believed his felony status

4

prohibited only his possession of handguns. When Deputy Lampe told defendant that he was prohibited from possessing any firearm, defendant claimed the rifle "technically" belonged to his cousin.

**C. Zemke's Statement and Consent to Search and Seize Firearm**

Once they arrived at the law enforcement center, between approximately 8:30 and 9:00 p.m., Deputy Lampe took defendant into the jail to be booked. He also met with Zemke and Marshall, had them sit temporarily in the lobby of the law enforcement center, and then had them take a seat in a small room (approximately 8 foot by 6 foot) off the lobby. The door to the room remained open at all times. At this point, Humboldt Police Officer, Erin Bennett, arrived and took over obtaining a written statement from Zemke while Deputy Lampe returned to the jail to deal with defendant. In the room were Officer Bennett, Zemke, and Marshall.

Officer Bennett provided Zemke with a statement form, at the top of which is written: "I [handwritten Samantha Zemke] am not under arrest for, nor am I being detained for any criminal offenses concerning the events I am about to make known to [handwritten Deputy Cory Lampe]. Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following information of my own free will, for whatever purposes it may serve." Exhibit 2. In her written statement, Zemke related the events surrounding the assault. No mention is made of the firearm or search in the written statement. Officer Bennett described Zemke as calm and very cooperative, but angry at defendant for what he did to her. At one point, Officer Bennett had to leave the law enforcement center to go on a different domestic abuse call, returning a short time later.

On direct examination, Zemke was asked whether she felt like she had to be at the law enforcement center. She replied, "No," she felt like she could go home and sleep.

5

At some point while Zemke was writing her statement, Deputy Lampe returned to the room. Officer Bennett and Marshall were present. Deputy Lampe had, in the meantime, looked up defendant's criminal history and confirmed that he was a convicted felon. Deputy Lampe asked Zemke about the rifle in the house. Zemke stated that the rifle belonged to both defendant and her, and that she believed defendant could lawfully possess a rifle, despite being a felon. Zemke stated she last saw the rifle hanging on the wall in the dining room of the house.

Zemke told Deputy Lampe that defendant and she had just moved in the residence, but that they still had belongings in another rental unit in Fort Dodge. Zemke expressed her desire to return to the house in Thor to retrieve her personal belongings. Officer Bennett testified that Zemke "absolutely" wanted to return to the house to get her personal belongings. Zemke indicated that she wanted officers to go with her when she retrieved her belongings because she was worried that defendant's cousin may be present or return to the house, and he may be upset with her about getting defendant in trouble. Zemke testified that defendant and his cousin were close. In an affidavit, Zemke stated that she "was asking Officer Lampe to come back to the house with me to get my clothes." Exhibit B. Deputy Lampe agreed to go along, stating: "I have to get the gun so, okay." *Id.* According to Officer Bennett's recollection, Deputy Lampe asked "Is that okay?" According to Deputy Lampe, Zemke replied "that's fine." Marshall agreed to give Zemke a ride back to the house in Thor. Deputy Lampe stated that defendant had told him the house was locked, and Zemke did not have a key. According to Deputy Lampe and Officer Bennett, Zemke responded "that's fine, I know how to get in because Leo [defendant] has done it before."

During the contact with Zemke at the law enforcement center, during which she consented to officers going to the house to retrieve the firearm, Deputy Lampe stated that he used a conversational tone. In particular, when he told Zemke he

6

needed to get the firearm, he stated he used a conversational tone and did not use a harsh tone or raise his voice in such a way as to make it sound like a command. None of the witnesses, including Zemke, contradicted Deputy Lampe regarding his tone of voice. Deputy Lampe did not tell Zemke she could refuse consent to have law enforcement officers enter the house and seize the firearm. Deputy Lampe and Officer Bennett were in uniform and wearing sidearms, but their firearms remained holstered at all times.

At the hearing, Zemke testified that she did not feel she could refuse consent when Deputy Lampe said he needed to get the gun. When I asked her why she felt that way, however, Zemke said she did not think she could refuse a request made by a law enforcement officer. I asked her if there was any other reason, but she could not articulate any. Zemke testified that no officer threatened her with criminal charges or suggested she would get in trouble if she did not agree to allow them to retrieve the firearm.

### D. Search and Seizure

Deputy Lampe had Marshall follow his patrol car to the house in Thor. Deputy Lampe also arranged for Deputy Michael Vinsand (whose shift was just starting) to meet him at the residence. They arrived at approximately 9:30 p.m., and it was dark outside. Once at the residence, Zemke attempted to enter the house through the front door, but discovered it was locked. Defendant's cousin, Richard Fitzgerald, was not home at the time. Deputy Lampe asked her if there was any other way into the house. Zemke said she had seen defendant enter through an unlocked window. Zemke testified at the hearing that she had seen defendant's cousin get into the house through a window once when he locked his keys inside, and saw defendant enter the house through a window twice, once during the four days she had stayed with him in the house prior to the assault. Zemke attempted to enter the house through a window

on the front of the house through which she stated she had seen defendant enter the house. It was locked, however.

While Zemke was attempting to enter the house through the front window, Deputy Vinsand walked around to the back of the house and saw a window with an air-conditioner exhaust hose sticking out. According to Zemke's affidavit, Vinsand stated: "Hey, I found a way she can get in." Exhibit B. This is consistent with Deputy Vinsand's testimony that when he saw the window in that condition, he told the others and then stood back and let Zemke gain entry. Again, according to Zemke's affidavit, she asked Deputy Lampe what he wanted her to do, and he told her to push the vent in, climb through the window, and let them in through the front door. *Id*. In her affidavit, Zemke said she did that. *Id*. Deputies Lampe and Vinsand stated that they let her climb through the window on her own. Zemke testified that neither officer touched her and, although one of them brought her a chair to step on, she did not use it. Neither deputy, nor Zemke, mentioned Marshall being present at the back of the house, but Marshall testified that she was there, and that Zemke used a chair, and that the officers pushed the air conditioner exhaust aside, lifted the window, and physically assisted Zemke in through the window. I did not find Marshall's testimony credible in this regard because it was inconsistent with the rest of the testimony.

At the hearing, Zemke testified that after she was unsuccessful in getting into the house through a front window, she suggested they give up and she would come back another day to get her clothes. Zemke testified that in response, deputies told her that they were not going to leave the house without the gun. Marshall corroborated this version of events. I find this version to be incredible for several reasons. First, Zemke made no mention of such an exchange in the affidavit she provided prior to the hearing. Exhibit B. She testified at the hearing that the statements she made in that affidavit were true and correct. Second, I believe the testimony of Officer Bennett and Deputy Lampe that Zemke "absolutely" wanted to get into the house to retrieve her belongings and was very

8

fixated on that goal, including when she was at the house. At the same time, Zemke was concerned about the reaction defendant's cousin would have regarding her role in defendant's arrest. The idea that Zemke would give up trying to get in the house and would choose to contact the cousin later is inconsistent with this evidence. I also watched the demeanor and listened to the tone of the testimony of both Zemke and Marshall and found their testimony not credible. Each has a strong motive to shade the truth because of their relationship with defendant, and defendant had called each of them after his arrest and before the hearing. When this is combined with defendant having assaulted Zemke to the point of causing her to black out, I believe Zemke, in particular, had a strong motive to shade the truth to benefit her fiancé and the man who attacked her.

In any event, Zemke entered through the window and then let the deputies in through the front door. Zemke testified at the hearing that the officers just barged in the house without asking and that she only wanted them outside the house. She testified that once it was clear defendant's cousin was not there, she felt the deputies could leave. Deputy Lampe testified that Zemke opened the door and told them to "come in." I believe Deputy Lampe. Again, I found Zemke's testimony incredible for a number of reasons. First, in her affidavit, she made no such claim. Exhibit B. Second, her version is inconsistent with her desire to have the officers at the house to protect her from defendant's cousin. Third, it is inconsistent with her prior consent at the law enforcement center telling Deputy Lampe that it was "fine" with her for him to seize the firearm. Finally, it is inconsistent with her conduct in opening the door for the deputies to enter.

Once in the home, Zemke took the deputies in to the living room, pointed out the firearm hanging on the wall, and then went upstairs to retrieve her belongings. The deputies seized the firearm and wrote out a property receipt. Zemke then wrote a statement on a property receipt, stating: "I told the

9

officer he can take the gun." Doc. 18-2, at 17 (Exhibit A, page 17).

Zemke continued looking for belongings and was upset because she could not find all of her clothes. At one point, Zemke and Marshall suggested they come back another day to get Zemke's clothes, but Deputy Lampe suggested it would be best to keep looking because they had time and defendant's cousin was gone. The deputies attempted to help Zemke find her clothes, but without success. Zemke also showed Deputy Lampe the locations within the residence where defendant attacked her, and Deputy Lampe took photographs of those locations. Ultimately, Zemke loaded some clothes, a television, and a PlayStation into Marshall's car and left.

### E. Samantha Zemke

At the time of this incident, Zemke was twenty-six years old. She graduated from high school, worked full time in a retail store, and handled all the finances for her family consisting of defendant and their two minor children. She was arrested one time, approximately three years ago, for disturbing the peace, but the charges were dropped. She had no other experience with searches by law enforcement officers. She testified she has dyslexia, but has overcome the problem and is able to read and write. Although Deputy Lampe agreed with defense counsel that Zemke is rather naïve, or as Deputy Lampe said is more accurate, not very intelligent, he based that assessment on her spoken vocabulary and on the spelling mistakes she made in her written statement. I listened to and watched Zemke testify; I find she is of average intelligence and strong-willed.

Zemke testified that she had not consumed alcohol or controlled substances on August 25, 2016. Deputy Lampe testified that he did not have any reason to believe that Zemke was under the influence of alcohol or controlled substances.

> In general, I did not find Zemke entirely credible as a witness. The tone of her voice became markedly heightened and agitated when she began speaking about the search, volunteering answers without being asked, and purporting to indicate the officers adopted an aggressive position with her about getting into the house. Zemke was also hostile on cross examination. Zemke has a motive to shade the truth because she is still engaged to defendant, is the mother of his two children, has put $200 to $300 on his books while he has been in jail, and has maintained contact with him since his incarceration, despite a no-contact order.
>
> **F.    Defendant's Contact with Zemke Since His Arrest**
>
> After officers arrested defendant for domestic abuse, he was briefly detained and then released. A state no-contact order was in place. He violated the order when he was found in a car with Zemke. He was then arrested on the instant federal charge. The Court ordered him detained pending trial in this matter, noting as grounds, the existence of the no-contact order and expressing the belief that defendant posed a danger to Zemke. Thereafter, defendant violated the no-contact order multiple times by calling Zemke from jail. Those calls were recorded. Zemke testified that defendant called her a lot from jail. She also stated that defendant called his sister, Loreen Marshall, another sister, and his cousin. During some of the phone calls, Zemke sought defendant's permission, or at least agreement, with things such as whether she should dress in a 1970s style for a work-related event, and whether she should/could take their children to a pumpkin patch.

Report and Recommendation at 7-8.

## II. LEGAL ANALYSIS
### A. Standard of Review

A district judge must review a magistrate judge's report and recommendation in a criminal case under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* FED. R. CRIM. P. 59(b). Thus, when a party objects to any portion of a report and recommendation, the district judge must undertake a *de novo* review of that portion.

Any portions of an report and recommendation to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g., Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an report and recommendation under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

Yeager has filed objections to Judge Williams's Report and Recommendation. I, therefore, undertake the necessary review of Judge Williams's recommended disposition of Yeager's Motion to Suppress.

### B. *Yeager's Objections*

Yeager raises two objections to Judge Williams's Report and Recommendation. First, Yeager objects to Judge Williams's finding that Zemke voluntarily consented to the deputies' entry into the house and seizure of the rifle. Second, Yeager objects to Judge Williams's finding that Zemke did not withdraw her consent.

There was a sharp conflict in the testimony of prosecution witnesses Deputy Lampe and Officer Bennett, and defense witnesses Zemke and Marshall. Judge Williams's findings concerning Zemke's consent were based on his credibility determinations of the witnesses. Judge Williams credited the testimony of Deputy Lampe and Officer Bennett over that of Zemke and Marshall. Specifically, Judge Williams found Zemke and Marshall not to be credible witnesses.

"'[C]redibility is a determination for the trier-of-fact, and its assessment is virtually unassailable on appeal.'" *United States v. Bell*, 477 F.3d 607, 612 (8th Cir. 2007) (quoting *United States v. Rodriguez*, 414 F.3d 837, 845 (8th Cir. 2005)); *see United States v. Navarro–Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (A magistrate judge's credibility determination is entitled to "great deference."); *cf. Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) ("when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."). In making his creditability determination, Judge Williams relied on his observations of the witnesses' testifying. He

was clearly in the best position to judge the credibility of the witnesses testifying before him. *United States v. Mendoza–Gonzalez*, 363 F.3d 788, 794 (8th Cir. 2004) ("The district court is in the best position to judge the credibility of witnesses who testify before it. . . ."); *United States v. Cunningham*, 83 F.3d 218, 222 (8th Cir. 1996) ("An appellate court is 'not in the best position to judge the credibility of witnesses. It is for [the fact-finder] to assess the credibility of witnesses and resolve conflicting testimony.'"); *United States v. Newson*, 46 F.3d 730, 734 (8th Cir. 1995) ("The district court is in the best position to judge the credibility of witnesses who testify before it.").

After reading Judge Williams's Report and Recommendation, it is clear that Judge Williams made his credibility determinations by weighing the testimonies of all the witnesses, taking into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand. Further, there is nothing in the record that leads me to question Judge Williams's assessment of the defense witnesses' unreliability. Upon *de novo* review of the transcript of the evidentiary hearing, and all exhibits admitted at that hearing, I agree with Judge Williams's credibility determinations.[1] Zemke and Marshall both have strong motives to assist Yeager, their respective boyfriend and half-brother. Moreover, there were inconsistencies in their testimony and actions which undermine confidence in their candor. For example, as Zemke avers in her affidavit, she requested that Deputy Lampe accompany her back to the house to retrieve her personal belongings. She wanted to get her belongings out of the house before Yeager's cousin returned. Moreover, when she and the deputies found that the

---

[1] "When a magistrate's findings and recommendations rest upon the evaluation of the credibility of a witness, the district court is not required to rehear the testimony in order to conduct a *de novo* determination of the issues." *United States v. Bermudez*, 228 F.3d 424, 2000 WL 1871676, at *3 (6th Cir. Dec. 11, 2000) (citing *United States v. Raddatz*, 447 U.S. 667, 675–76, (1980)); *see United States v. Davis*, 362 Fed. App'x 632, 635 (6th Cir. 2010) ("[A] district judge may disregard a magistrate's credibility findings without listening to live testimony.").

14

house was locked, she informed the deputies how Yeager and his cousin had gained entrance through windows in the house and then looked to see if she could gain entry by that means. Yet, at the evidentiary hearing, Yeager testified that she did not want to pursue getting her belongings when they found the house locked. Given her desire to avoid a confrontation with Yeager's cousin, it is far more plausible that Zemke would not so readily abandon her chance to gather her belongings. Moreover, Zemke's willingness to abandon her efforts to retrieve her belongings from the house smacks of recent invention, as no such factual claim was made in Zemke's affidavit. Finally, Zemke's claim was contradicted by Marshall, who did not mention any desire by Zemke to abandon her retrieval efforts in her testimony. Given the totality of the evidence, I agree with Judge Williams's credibility determinations of Deputy Lampe, Officer Bennett, Zemke, and Marshall, and overrule Yeager's objections.

After considering Judge Williams's Report and Recommendation, Yeager's objections, and undertaking a *de novo* review of the record, I accept Judge Williams's Report and Recommendation.

### III. CONCLUSION

Therefore, for the reasons discussed above, I, upon a *de novo* review of the record, accept Judge Williams's Report and Recommendation and deny defendant Yeager's Motion to Suppress.

**IT IS SO ORDERED**.

**DATED** this 27th day of January, 2017.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA